UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hidden Lakes Development, LP,
Plaintiff,

v.

Civ. No. 02-406 (JNE/JGL)
ORDER

Allina Health System and Park Construction Co.,
Defendants,

and

Allina Health System and Park Construction Co.,
Third-Party Plaintiffs,

v.

Transitional Hospitals Corporation,
Third-Party Defendant.

---

William Flynn, Esq., Peter Tester, Esq., and Dick Nowlin, Esq., Lindquist & Vennum P.L.L.P., appeared for Plaintiff Hidden Lakes Development, LP.

Keith Moheban, Esq., Leonard, Street and Deinard, P.A., appeared for Defendant and Third-Party Plaintiff Allina Health System.

Mark Lee, Esq., Maslon Edelman Borman & Brand, LLP, appeared for Defendant and Third-Party Plaintiff Park Construction Co.

Stacy Bettison, Esq., and William Hefner, Esq., Greene Espel, P.L.L.P., appeared for Third-Party Defendant Transitional Hospital Corporation.

---

Hidden Lakes Development LP (HLD) brought this action against Allina Health System (Allina) and Park Construction Co. (Park) (collectively, Defendants) for damages arising out of the sale of a 68-acre property (Property) in Golden Valley, Minnesota. HLD alleges that Defendants violated the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 – 9675 (2000), and the Minnesota Environmental

Response and Liability Act (MERLA), Minn. Stat. §§ 115B.02-04 (2002), and it alleges state-law claims for breach of contract, misrepresentation, nuisance, and contribution. Defendants impleaded Transitional Hospitals Corporation (THC) and cross-claimed THC for contribution. The case is before the Court on Defendants' motions for summary judgment on all claims, HLD's motion for partial summary judgment as to Defendants' liability under CERCLA and MERLA, and THC's motion for summary judgment. For the reasons set forth below, the Court denies HLD's motion, grants in part and denies in part Defendants' motions, and grants THC's motion.

## I. BACKGROUND

From 1940 to 1984, Allina's corporate predecessors (collectively, Allina's predecessors)[1] owned and operated healthcare facilities on the Property. During that time, Allina's predecessors extensively renovated the existing structure on the Property and built additional structures. In 1970, Allina's predecessors began a project to fill a large ravine on the Property, known as "the Central Valley." Allina's predecessors used the demolition from renovation projects to fill the Central Valley. After several years of limited success, Allina's predecessors decided on a more aggressive plan to fill the Central Valley. Accordingly, in 1978, they entered into an agreement with Park whereby Park used construction debris generated by its construction work to fill the Central Valley. Allina's predecessors and Park completed the project in 1980.

In 1984, Allina's predecessors sold approximately 32 acres of the Property, which included the health care facilities and Central Valley, to Golden Valley Health Center (GVHC) and retained two lots on either side of GVHC's parcel. THC later purchased GVHC's parcel and

[1] The parties agree that the corporate arrangements that preceded the July 1994 formation of Allina Health System are numerous and complex and that under CERCLA, Allina retains successor liability.

operated a clinic on that parcel. In 1995, Allina and THC agreed to sell their parcels to HLD. In the course of HLD's due diligence, HLD learned of the construction fill in the Central Valley.

In October 1997, when HLD began developing the Property for residential housing, it discovered that part the Central Valley fill contained asbestos contaminated materials (ACM). It also discovered a deposit of naphthalene near the Central Valley. Upon discovery of the ACM, HLD's excavating team contacted the Minnesota Pollution Control Agency (MPCA). HLD then removed the fill containing ACM and piled it onto the Property. HLD eventually reburied the fill containing ACM on another portion of the property and, per MPCA mandate, placed a deed restriction upon that portion of the Property.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A. CERCLA

In an effort to receive compensation from Defendants for costs incurred in HLD's disposal of hazardous materials[2] found on the Property, HLD alleges claims both for direct cost recovery under CERCLA section 107(a), 42 U.S.C. § 9607(a), and for contribution under CERCLA section 113(f), 42 U.S.C. § 9613(f). To establish the prima facie case for liability under both sections, HLD must show: (1) Defendants are potentially responsible parties (PRPs); (2) a release or threatened release of hazardous substance occurred at the Property; (3) the release caused HLD to incur response costs; and (4) the response costs were necessary and consistent with the National Contingency Plan (NCP), 40 C.F.R. §§ 300.1-.1105 (2000). *Johnson v. James Langley Operating Co.*, 226 F.3d 957, 961-62 (8th Cir. 2000).

"The central difference between a cost recovery action under section 107 and a contribution action under section 113 is that in a section 107 action, a party can impose joint and several liability for all its cleanup costs upon the defendants[s]." *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 415 (4th Cir. 1999). The Eighth Circuit has held that a plaintiff who is also a PRP may not recover under section 107 and is limited to a section 113 claim, unless that party is eligible for one of three defenses. *See Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 530 (2003). This is because "when one of the enumerated CERCLA defenses applies a PRP is deemed innocent; and an action between an innocent party and another PRP is not between two liable parties." *Id.* at 531.

Defendants contend that HLD is not entitled to direct cost recovery under section 107 because HLD is a PRP who contributed to the contamination on the Property. In support,

---

[2] Specifically, HLD seeks compensation for its treatment of ACM and naphthalene discovered in and around the Central Valley. The parties agree that these substances are categorized as hazardous materials under CERCLA.

Defendants point to the contamination that HLD released in its demolition of the buildings on the Property. The record reveals that the MPCA fined HLD $62,000 for having improperly disposed of ACM from August to November 1997 and that this period of MPCA oversight overlapped with the discovery of the ACM in the Central Valley in October 1997.

HLD concedes that as a present owner of the Property it qualifies as a PRP[3] but asserts nonetheless that it is entitled the third-party defense found in section 107. A third-party defense is available under section 107 if a PRP can prove by a preponderance of the evidence that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by … an act or omission of a third party other … than one whose act or omission occurs in connection with a contractual relationship existing directly or indirectly with the defendant." 42 U.S.C. § 9607(b). However, because "contractual relationship" under this section includes the land-sale agreement between the parties, *see* 42 U.S.C. § 9601 (35)(A), HLD is precluded from the third-party defense unless:

> the real property on which the facility concerned is located was acquired by [HDL] after the disposal or placement of the hazardous substance on, in, or at the facility, and ….
>
> > (i) At the time the defendant acquired the facility *the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility*.

42 U.S.C. § 9601 (35)(A)(i) (emphasis added). Known as the "innocent landowner exception,"[4]

---

[3] CERCLA provides four categories of PRPs: (1) past or present owners of the facility; (2) past or present operators of the facility; (3) transporters of the waste from the facility; or (4) arrangers for the transportation or disposal at the facility. *See* 42 U.S.C. § 9607(a)(1)-(4).

[4] The Court notes that there is a judicially created exception known as "the innocent landowner defense." *See e.g. NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 1235, 1241-42 (7th

HLD asserts that it is entitled to this defense because it did not know of the contamination in the Central Valley at the time of purchase. In support, HLD relies on *United States v. Domenic Lombardi Realty*, 204 F. Supp. 2d 318 (D.R.I. 2002). In that case, questions of fact regarding the landowner's knowledge of the contamination on the land prior to sale precluded summary judgment. *Domenic Lombardi*, 204 F. Supp. 2d at 333-34. Unlike the situation in *Domenic Lombardi*, there are no genuine issues of material fact regarding HLD's knowledge because its pre-sale environmental survey identified a variety of contaminates on the property and its due diligence letter from its lawyers specifically advised HLD to conduct environmental tests. Moreover, HLD concedes to knowing about the presence of asbestos on the Property (albeit in locations other than the Central Valley) and the existence of construction debris in the Central Valley. Because the third-party defense is only available if HLD did not have *any* knowledge of the contamination, *see* 42 U.S.C. § 9601 (35)(A)(i), and because HLD admits to knowing about asbestos in other parts of the Property, it is ineligible for the innocent landowner defense. *See Bob's Beverage, Inc. v. ACME, Inc.*, 169 F. Supp. 2d 695, 714 (N.D. Ohio 1999) ("This exception … is exclusive and must be rigorously applied.").

Furthermore, the Court notes that HLD's reliance on *Domenic Lombardi* is misplaced because HLD itself contributed to the Property's contamination. Where multiple sources of contamination exist at a CERCLA site, the presumption is that the site is one facility unless a party demonstrates good cause for dividing it into separate contamination sites. *See Axel Johnson*, 191 F.3d 418-20. HLD fails to raise the issue of divisibility of the Property's contaminated areas. As such, the Court considers the Property as a whole; therefore, HLD's contamination of the Property further precludes it from escaping its PRP status.

---

Cir. 2000). Here, only the statutory scheme of section 107 is before the Court.

Because HLD knew of some, if not all, of the contamination prior to sale, and because HLD is a PRP who contributed to the Property's contamination, HLD may not claim CERCLA's third-party defense and may not seek direct recovery under section 107. Accordingly, the Court denies HLD's motion for partial summary judgment on liability under section 107 and grants Defendants' motions for summary judgment as to HLD's section 107 claim.

1. Section 113

With regard to HLD's section 113 claim, Defendants assert that they are entitled to summary judgment because HLD's response costs were neither necessary nor consistent with the NCP. "The NCP is a set of EPA regulations that establishes procedures and standards for responding to releases of hazardous substances. The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect the public health and the environment." *State of Minn. v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019 (8th Cir. 1998) (internal quotations omitted). "Non-governmental entities must prove that their response costs are consistent with the NCP in order to recover them." *United States v. Northeastern Pharm. & Chem. Co.,* 810 F.2d 726, 747 (8th Cir. 1987). "Whether there has been substantial compliance [with the NCP] is a mixed question of law and fact." *Union Pac. R.R. Co. v. Reilly Indus. Inc.*, 215 F.3d 830, 835 (8th Cir. 2000).

Specifically, Defendants assert that HLD failed to substantially comply with the public notice requirement of the NCP that requires "private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(6). Defendants contend that HLD's remediation plan was a *fait accompli* by the time any public meetings took place. In support, they point to the disparity in time between

the discovery of contamination in October 1997 and the occurrence of the first public meeting in March 1999. Defendants also rely on *Union Pacific*, which held that the plaintiff failed to comply with the NCP public notice requirement because when the public hearings occurred, the plaintiff had not prepared any alternative remediation options and had already begun its remediation efforts. *Union Pacific*, 215 F.3d at 836-38. The *Union Pacific* court found that the meetings were meaningless because the course of remediation was a forgone conclusion. *Id*. Here, Defendants assert that HLD's actions are similar to the *Union Pacific* plaintiff in that HLD discovered and excavated the Central Valley's ACM almost a year and a half before holding public meetings.

In response, HLD contends that this case is distinguishable from *Union Pacific* because its efforts here first began as a removal action that subsequently turned into a remedial action. In contrast, the parties in *Union Pacific* agreed that the response action was remedial, and the trial court noted that "[r]emedial actions are subject to a much higher degree of regulation than that required by removal actions." *Union Pac. R.R. Co. v. Reilly Indus. Inc.*, 981 F. Supp. 1229, 1236 n.1 (D. Minn. 1997) *vacated in part on other grounds*, 1998 WL 1768404 (D. Minn. Jan 12, 1998) *aff'd*., 215 F.3d 830 (8th Cir. 2000). According to HLD, the initial discovery of ACM in the Central Valley created an emergency removal situation. HLD points to the testimony of Lynn Grigor, an MPCA representative assigned to the Central Valley site, who testified that "we were operating in an emergency mode as opposed to one where we were looking at a complete investigation and cleanup at that point in time." (Grigor Depo. at 31). In her deposition, Grigor explained that the situation was an emergency because "the materials … were already being stockpiled on the site … and we had concerns about the workers on site and the dust blowing to neighboring areas." *Id.* HLD contends that after the emergency subsided and the removal was

completed, it began the permanent remediation and took the necessary steps to comply with NCP public hearing requirement. In response to HLD's arguments, Defendants maintain that there was no emergency, and that Grigor's testimony is an aberration.

A removal action is a short-term, limited effort to abate any immediate threat posed at the site, *see* 42 U.S.C. § 9601(23), and a remedial action refers to the permanent abatement of a site, *see id*. § 9601(24). Specifically, 40 C.F.R. § 300.410, which addresses removal actions, does not require the same public notice requirement found in § 300.700, the regulation at issue in *Union Pacific*. There are factual distinctions between this case and *Union Pacific*, especially with respect to the fact that the parties here do not agree about whether HLD's response action at the Central Valley was a removal or a remedial action. Although HLD's full compliance with the NCP appears questionable, the Court nonetheless finds that whether there was an emergency is a disputed issue of material fact that precludes summary judgment. Accordingly, the Court denies Defendants' motions for summary judgment and HLD's motion for partial summary judgment as to HLD's section 113 claim.

**B. MERLA**

Similar in form and content to CERCLA, MERLA contains a temporal defense that is not available under CERCLA. *See* Minn. Stat. §115B.04 subd. 6. That defense precludes recovery of response costs on claims relating to contamination that occurred on or before April 1, 1982, unless a plaintiff receives agency authorization as provided for in Minn. Stat. § 115B.17 subd. 17. *See* Minn. Stat. §§ 115B.04 subd. 6, 115B.15. The parties agree that the Central Valley fill was deposited prior to April 1, 1982. In December 2000, HLD obtained a letter from James Warner, Director of the Majors and Remediation Division at the Minnesota Pollution Control Agency (MPCA), permitting HLD to pursue recovery under MERLA. The parties disagree as to

whether this constitutes proper agency authorization to allow recovery.

According to Defendants, Warner does not have authority to issue an authorization letter; rather, they argue that approval must come through the MPCA board. In response, HLD asserts that Warner had—and has—the appropriate governmental authority to sign an authorization letter. In support, HLD submits an affidavit from Warner in which he asserts that he has authority to issue response action letters and that he has issued such letters in the past. Warner also provided a copy of a delegation of authority letter from the MPCA Commissioner to Warner delegating broad powers under Minn. Stat. §§ 115B.01-115B.24. While the letter delegating authority to Warner does not specifically provide for issuance of response action letters under Minn. Stat. § 115B.04 subd. 6., neither does it exclude such letters. Without more, Defendants' argument on this point is unavailing. Accordingly, the Court denies Defendants' motions for summary judgment.

**C. Breach of Contract and Misrepresentation**

HLD alleges that Allina breached section 8.05 of the parties' purchase and sale agreement. That section provides:

> As used in this Section 8(05), references to Seller's knowledge shall be limited to the knowledge of officers and employees of Seller at the level of director of facilities (or comparable position) and above. The foregoing shall include, without limitation, officers at the level of vice president and above. *To the best of Seller's knowledge, without any due diligence or investigation,* no toxic or hazardous substances or wastes, pollutants, or contaminants (including, without limitation, asbestos, … and any hazardous substances as defined by [CERCLA]) have been generated, treated, stored, released, or disposed of, or otherwise placed, deposited in or located on the Property, nor has any activity been undertaken on the Property that would cause or contribute to … (b) a release or threatened release of toxic or hazardous wastes or substances pollutants, or contaminants, from the Property within the ambit of CERCLA or any similar state law or local ordinance…. *To Seller's knowledge, no substances or conditions exist in or on the Property that may support a claim or cause of action under RCRA, CERCLA or … MERLA ….*

(Emphasis added).

Allina asserts that it is entitled to summary judgment because it did not breach section 8.05. Specifically, Allina contends that there are no Allina employees now, and there were no employees at the time the agreement was signed, who had knowledge of hazardous waste disposal on the Property. In response, HLD argues that section 8.05 is not limited to Allina employees but that it extends to employees of Allina's predecessors—namely Cris Stang, Jack Tabry, and Peter Van Hauer.

Under Minnesota law, a claim for breach of contract consists of four elements: (1) formation of the contract; (2) performance by plaintiff of any conditions precedent to his right to demand performance by defendant; (3) a material breach of the contract by defendant; and (4) damages. *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000); *see Indus. Rubber Applicators, Inc. v. Eaton Metal Prods. Co.*, 171 N.W.2d 728, 731 (Minn. 1969), *overruled on other grounds by Standslast v. Reid*, 231 N.W.2d 98 (Minn. 1975). The interpretation of an unambiguous contract presents a question of law. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn. 1980). A court must construe a contract as a whole and attempt to harmonize all of its clauses. *Chergosky v. Crosstown Bell*, 463 N.W.2d 522, 525 (Minn. 1990).

The Court's review of the agreement reveals that it is an unambiguous contract. The parties describe "Seller" solely as "Allina Health System," and nowhere in the agreement, including section 8.05, is any reference made to Allina's predecessors. Accordingly, HLD's argument that the contract extends to non-Allina employees, including Stang, Tabry and Van Hauer, is without merit.

There is no dispute that at the time of the closing both Allina and HLD were aware that the Central Valley had been filled with construction debris. HLD nonetheless argues that

because Allina employees Michael Boo and Mary Foarde knew about the construction fill in the Central Valley, they are imputed with the knowledge that the fill contained hazardous substances. In support, HLD directs the Court to Allina's Answer to Interrogatory No. 7, which states:

> Michael Boo, who was a Vice President of Allina at the time of the purchase agreement between Allina and [HLD] was executed had some awareness at that time that filling activities had occurred at the [Land], but no first-hand knowledge. Further, in a good faith effort to respond to this interrogatory, Allina has inquired of current Allina employees at the level of Vice President or above to determine whether such persons had information responsive to this request. To date no such persons have indicated that they have information responsive to this request.

This answer does not raise a question of material fact that Boo knew that the debris contained hazardous materials. In particular, according to Answer to Interrogatory No. 7, Boo had no first-hand knowledge of the fill and no specific knowledge of hazardous waste. Without more, a genuine issue of material fact is not created simply because someone had "some awareness" of filling activities.

Turning to Foarde, who is Allina's General Counsel, HLD asserts that she "had to know that Allina had done nothing to confirm that no hazardous [materials]" were contained in the Central Valley fill. However, section 8.05 is limited to the knowledge of Allina's employees, *without due diligence or investigation*. As such, even if HLD's assertion that Foarde knew that there was no investigation is true, it would not constitute a breach of section 8.05. Because HLD fails to raise a genuine issue of material fact as to whether any Allina employee—including Boo and Foarde—knew that the Central Valley fill contained hazardous waste, the Court grants Defendants' motions for summary judgment on HLD's breach of contract claim.

HLD also relies on section 8.05 as a foundation for its misrepresentation claim. Under Minnesota law, the elements of a cause of action for fraudulent misrepresentation are: (1) there

must be a representation; (2) that representation must be false; (3) it must have to do with a past or present fact; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) the representer must intend to have the other person induced to act, or justified in acting upon it; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; (11) that damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury. *Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37, 38-39 (Minn. 1967).

Here, HLD claims that section 8.05 constitutes a representation Allina made to HLD that the Property was free from hazardous materials. The Court disagrees. First, under Minnesota law, a plaintiff may not convert a breach of contract action into a tort action without an independent duty. *Wild v. Rarig*, 234 N.W.2d 775, 789-90 (Minn. 1979). As such, section 8.05 is a contract promise actionable under a breach of contract theory; without more it may not be converted into a misrepresentation claim without more. Second, even assuming that a misrepresentation claim could be maintained based on a contract promise, section 8.05 does not represent that the property was free from hazardous waste. Rather, it is limited to only upper-level employees *of Allina* with knowledge about hazardous materials. Finally, as discussed above, HLD has put forth no evidence that this provision was breached—i.e., that anyone at Allina knew that the construction fill in the Central Valley contained hazardous waste. For these reasons, the Court grants Defendants' motions for summary judgment as to HLD's misrepresentation claim.

**D. Nuisance**

Park asserts that Defendants are entitled to summary judgment because HLD's nuisance claim is time-barred. According to Park, the Central Valley is an improvement to real property and therefore subject to a two-year statute of limitations. Under Minnesota law, a claim of nuisance arising out of a defective and unsafe condition of an improvement to real property is subject to Minn. Stat. § 541.051. *Nolan & Nolan v. City of Eagan*, 673 N.W.2d 487, 496-97 (Minn. Ct. App. 2003). Section 541.051 provides:

> Except where fraud is involved, no action by any person in contract, tort or otherwise to recover damages for any injury to property, real or personal, … arising out of the defective and unsafe condition of an improvement to real property … shall be brought against an person performing or furnishing the design, planning, supervision, materials or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury ….

Minn. Stat. § 541.051 subd 1(a).

HLD argues that section 541.051 does not apply because the Central Valley is not an improvement to real property. In *Pacific Indemnity Co. v. Thompson-Yeager, Inc.*, 260 N.W.2d 548 (Minn. 1977), the Minnesota Supreme Court defined an improvement to real property as a "permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Pacific Indemnity*, 260 N.W.2d at 554.

The record reveals that the purpose in filling the Central Valley was to improve the dangerous condition of the ravine. Cris Stang, the Building and Grounds Manager in the 1970s who ordered the filling of the Central Valley, testified that "[i]t was … unsightly, it was not well kept, it was a mosquito breeding ground, it was dangerous because we had children in facilities clearly nearby, it was a pit of about 35 to 50 feet deep, and it had … in my view a high priority to correct the situation." (Stang Depo. at 32). Under the *Pacific Indemnity* factors, the filling of

the Central Valley constitutes an improvement to real property because (1) it is a permanent addition to the real property; (2) it enhanced the value both by increasing the usability and remedying an unsafe area; (3) it involved years of labor; (4) it was designed to remedy an unsafe ravine and make the land usable; and (5) cannot be considered an ordinary repair.

HDL argues that the Central Valley cannot qualify has an improvement to real property because the fill included hazardous waste. The Court disagrees with that argument because it would act to allow any defect to negate a project's qualification as an improvement to real property. The presence of ACM in the fill may constitute a defective or unsafe condition, but it does not necessarily disqualify the Central Valley as an improvement to real property. *See Appletree Square 1 Ltd. P'ship v. W. R. Grace & Co.*, 815 F. Supp. 1266, 1273 (D. Minn. 1993) (finding that presence of asbestos in building was a defect to an improvement to real property under § 541.051).

Because the Central Valley is an improvement to real property as defined by Minnesota law, and the parties do not dispute that this claim was brought more than two years after discovery of the ACM and naphthalene in the Central Valley, HLD's nuisance claim is time-barred under § 541.051. Accordingly, the Court grants Defendants' motions for summary judgment as to HLD's nuisance claim.

**E. Common-law Contribution**

Park next asserts that CERCLA preempts HLD's that common-law contribution claim. In support, Park relies on *Bedford Affiliates v. Sills*, 156 F.3d 416 (2d Cir. 1998). In that case, the Second Circuit Court of Appeals analyzed whether common-law contribution claims were preempted by CERCLA. After acknowledging that CERCLA does not expressly preempt all state-law claims, the Second Circuit held:

> In enacting § 113(f) as part of [the Superfund Amendments and Reauthorization Act (SARA)]--an Act that expressly created a statutory right of contribution--Congress created a statutory settlement scheme. The scheme was put in place to aid the expeditious resolution of environmental claims. To accomplish this objective Congress employed incentives for potentially responsible parties to settle and strong disincentives for non-settling potentially responsible parties. Thus, potentially responsible parties who choose to settle are granted protection from contribution actions being asserted against them under § 113(f)(2), but retain the right to bring contribution actions against other non-settling parties. *See* CERCLA § 113(f)(3)(B). The statute further provides that the amount recoverable from the remaining non-settling parties is reduced only by the amount of the settlement. *See* CERCLA § 113(f)(2). Hence, potentially responsible parties who choose to settle gain protection from contribution, enjoy potentially favorable settlement terms, and retain the ability to seek contribution from other defendants. Those responsible parties who choose not to settle are barred from seeking contribution from the settling parties and thereby face potentially disproportionate liability. *See In re Reading Co.*, 115 F.3d at 1119.
>
> As a result, it can easily be seen that instituting common law restitution and indemnification actions in state court would bypass this carefully crafted settlement system, creating an actual conflict therefore between CERCLA and state common law causes of action. Consequently, CERCLA preempts the state law remedies of restitution and indemnification.

*Bedford Affiliates*, 156 F.3d at 427.

In response, HLD does not challenge the reasoning of *Bedford Affiliates* but contends instead that neither the Fifth Circuit nor the Eighth Circuit has adopted this holding. The Court's review of the case law cited by HLD reveals that both circuits have neither adopted nor rejected the *Bedford Affiliates* analysis; indeed, neither court reached the issue. *See Union Pacific*, 215 F.3d at 842 n.11 ("We … decline to address the preemption issue at this time."); *Aviall Servs., Inc. v. Cooper Indus. Inc.*, 312 F.3d 677, 691 n.30 ("We express no view on the preemption question."). Furthermore, after dismissing the CERCLA claims, the *Union Pacific* district court allowed plaintiff's common law contribution claim to go forward and eventually dismissed the claim because plaintiff's failed to show why an equitable remedy was necessary when a legal remedy would have been adequate had plaintiff not missed the statute of limitations under

MERLA. *See Union Pacific*, 215 F.3d at 842. Where, as is the case here, there are viable CERCLA and MERLA claims with legal remedies available, the Court finds the logic of *Bedford Affiliates* persuasive. Accordingly, the Court grants Defendants motions for summary judgment to as to HLD's common-law contribution claim.

**F. THC's motion for summary judgment**

THC contends that it is entitled to summary judgment on Defendants' claims because THC and HLD entered into a settlement agreement that bars Defendants' cross-claims for contribution.[5] When Congress enacted CERCLA, it did so with twin goals, to encourage a quick response and to place the cost of that response on those responsible for the hazardous condition. *Control Data Corp. v. S.C.S.C. Corp*, 53 F.3d 930, 936 (8th Cir. 1995). Coextensive with these goals is an interest in minimizing litigation and encouraging settlement. *See Atl. Richfield Co. v. Am. Airlines, Inc.*, 836 F. Supp. 763, 775 (N.D. Okla. 1993). With respect to cross-claim bar settlements:

> It would be hard to imagine that any defendant in a CERCLA action would be willing to settle if, after the settlement, it would remain open to contribution claims from other defendants. The measure of finality which a cross claim bar provides will make settlements more desirable. A settling defendant therefore 'buys its peace' from the plaintiff, as being relieved of liability to co-defendants frees the settling defendant from the litigation.

*Allied Corp. v. Acme Solvent Reclaiming Inc.*, 771 F. Supp. 219, 222 (N.D. Ill. 1990). Furthermore, "[c]ourts will enforce a contract allocating CERCLA liability when the provisions of the contract evince a clear and unmistakable intent of the parties to do so." *Lion Oil Co. v. Tosco Corp.* 90 F.3d 268, 270 (8th Cir. 1996) (internal quotations omitted).

On November 2, 2001, THC and HLD signed a settlement agreement and release

---

[5] Also before the Court is THC's motion requesting an equitable lien be imposed against HLD's recovery. At this time, the Court denies without prejudice the motion; THC is free to

whereby THC paid over $2 million,[6] and HLD agreed to indemnify and defend THC against future actions relating to CERCLA and MERLA claims. The parties do not dispute that the release is valid, that it covers the CERCLA and MERLA claims at issue here, and that THC paid over $2 million. HLD has not appeared on this issue, either to defend THC as provided for by the agreement or to contest the validity of the agreement. Nevertheless, THC "bought its peace" from HLD with a hefty price tag. To allow THC to be exposed to Defendants' claims for contribution would be inapposite to the interests of justice and the goals of CERCLA. Given the absence of any opposition to the fairness and reasonableness of the settlement, the Court approves the settlement's provision providing a cross-claim bar. Accordingly, the Court grants THC's motion insofar as it bars Defendants' cross-claims for contribution.

The Court's inquiry is not yet over, however, for still at issue is the question of how to apply the proceeds of THC's settlement to any damages HLD may recover. Defendants argue that the Court *must* apply THC's settlement pro tonto. Neither the Eighth Circuit Court of Appeals nor this Court has yet addressed the issue of the proper credit rule to be applied in CERCLA cases brought by private parties, and contrary to Defendants assertions, the Court's review of the relevant case law reveals that the issue is not well-settled.

Under CERCLA, courts faced with this question have chosen between the application of proportionate and pro tonto credit rules. *See generally, Atl. Richfield Co.*, 836 F. Supp. at 769-74 (collecting and discussing CERCLA settlement case law). The proportionate approach stems from the Uniform Comparative Fault Act (UCFA) and results in the reduction of the plaintiff's

---

raise this motion again at a later date.

[6] The Court notes that the release itself only demands $500,000 in consideration; however, the parties agree that a series of three additional payments is applicable to the total amount paid in settlement costs.

claim by the percentage of the settling defendant's causal fault. Under that approach, the court determines at trial all parties,' including the settling parties,' percentage of fault along with the amount of total damages. Regardless of whether the settling party's payment is equal to its determined percentage, it is credited as having paid its determined percentage of fault. Conversely, the pro tonto rule, found in the Uniform Contribution Among Tortfeasors Act (UCATA), applies a straightforward credit of the settlement towards plaintiff's ultimate damage recovery, leaving non-settling defendants liable for the remainder of the ultimate damages amount. This method requires the court to evaluate the settlement agreement for good faith and fairness, to ensure no collusion occurred.

Prior to the 1986 enactment of CERCLA section 113, courts wrestling with this issue applied the proportionate rule. *See United States v. Conservation Chem. Co.*, 628 F. Supp. 391 (W.D. Mo. 1985). However, when Congress created section 113's settlement scheme for settlements with the United States or a State, it chose to use a pro tonto approach instead of the proportionate rule, *see* 42 U.S.C. § 9613 (f)(2)-(3), and remained silent as to how proceeds of private party settlements should be credited. Some courts have interpreted this silence to mean that the credit rules should be applied at the court's discretion on a per case basis, *see e.g.*, *Atlantic Richfield,* 628 F. Supp. at 772 n.12, while at least one other courthas interpreted the silence to mean that the proportionate share rule should be applied to private parties. *See New York v. Solvent Chem. Co.*, 984 F. Supp. 160, 168 (W.D.N.Y. 1997). Still other courts continue to apply the proportionate credit rule in an effort to create a uniform approach. *See Lyncott Corp. v. Chem. Waste Mgmt.*, 690 F. Supp. 1409, 1417 (E.D. Pa. 1988); *Allied Corp.*, 771 F. Supp. at 223.

Given the successes of courts employing both rules, the Court concludes that it must

choose a credit rule that, on the facts of this case alone, best promotes the interests of CERCLA and the governmental interests in settlement. Therefore, the Court first looks to the agreement itself, which contains a provision that the settlement is to be construed as a *Pierringer* release. A *Pierringer* release is one in which a plaintiff may settle his claims against some tortfeasors while reserving the remainder of his cause of action against the non-settling tortfeasors. *Frey v. Snelgrove*, 269 N.W.2d 918, 921 (Minn. 1978). As applied here, the *Pierringer* release would operate in the same fashion as the UCFA proportionate rule.

While this statement of intent by the parties would normally counsel the Court to apply the proportionate rule, the record before the Court suggests otherwise. Specifically, HLD's expert report of Matthew Low totaled the remediation costs for the Central Valley ACM at $2,567,287.01, and he allocated the costs as follows: Allina, 80-85%; Park, 10-15%; and HLD, 0-10%.[7] Assuming for the sake of this analysis that HLD could prove these costs, under the proportionate rule HLD's expert has assessed THC with no liability. As such, THC's settlement proceeds would be a complete windfall for HLD—a windfall of almost 80% of its enumerated

---

[7] The Court disregards HLD's claims for naphthalene remediation costs in part for simplicity in calculations and in part because HLD has presented no evidence as to where the naphthalene originated and other than its proximity to the Central Valley, that either Allina or Park contributed to it. The Court also notes that with regard to any economic damages claimed, HLD may not recover under either CERCLA or MERLA. In enacting CERCLA, Congress "clearly manifested an intent not to provide compensation for economic losses or for personal injury resulting from the release of hazardous substances." *Artesian Water Co. v. Gov't of New Castle County*, 659 F. Supp. 1269, 1285-86 (D. Del 1987), *aff'd* 851 F.2d 643 (3rd Cir. 1988); *see Thompson v. Andersen Window Corp.*, Civ. No. 4-88-229 1989 WL 2330 *4 (D. Minn Jan. 17, 1989). Although MERLA is broader than CERCLA in that it allows recovery for actual economic losses, *see* Minn. Stat. § 115B.05 (2004); *Norwest Fin. Leasing, Inc. v. Morgan Whitney, Inc.*, 787 F. Supp. 895, 902 (D. Minn 1992); *State of Minn. v. Gopher Oil Co.*, Nos. C1-95-738, C2-95-733 1995 WL 687688 *4 (Minn. Ct. App. 1996), a limitation is imposed by Minn.

Stat § 115B.06 that allows for recovery under § 115B.05 only for releases occurring after 1983. Here, the parties agree that any liability applicable to either Park or Allina occurred before 1983.

costs. Under the pro tonto approach, THC's payment would be credited against HLD's claimed costs and the remainder—roughly $500,000—would be allocated amongst HLD, Allina and Park.

Given the windfall that HLD stands to gain from THC's payment if the Court employed a proportionate rule, Defendants' incentive would be to furiously litigate the proportion of liability of attributable to THC. Likewise, HLD would be strongly motivated to play down THC's liability. Thus the proportionate rule, if applied here, would operate to increase, rather than minimize litigation. Accordingly, the Court is persuaded that the pro tonto approach would more effectively serve the goals of CERCLA as well as the interests of justice.

Having already approved the settlement for fairness and good faith, the Court has fulfilled the required UCATA fairness determination. Thus, the Court will apply the THC's settlement[8] pro tonto to any recovery HLD is awarded.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. HLD's motion for partial summary judgment [Docket No. 39] is DENIED.

2. Allina's motion for summary judgment [Docket No. 48] is GRANTED in part and DENIED in part.

3. Park's motion for summary judgment [Docket No. 63] is GRANTED in part and DENIED in part.

---

[8] As noted above, the settlement addresses a portion of the $2 million paid by THC to HLD. The UCATA § 4 provides that the settlement "reduces the claim against the others to the extent of any amount stipulated by [the settlement], or in the amount of the consideration paid for it, whichever is the greater …." Based on the submissions of the parties, including HLD's summary judgment papers, the Court concludes that THC paid $2,000,256.04 in consideration for the release.

4. THC's motion for summary judgment [Docket No. 55] is GRANTED and its $2,000,256.04 settlement contribution will be applied pro tonto to any damages awarded to HLD in this case.

5. THC's motion for an equitable lien [Docket No. 55] is DENIED WITHOUT PREJUDICE.

6. Allina's claim for contribution against THC [Docket No. 24] is DISMISSED.

7. Park's claim for contribution against THC [Docket No. 20] is DISMISSED.

Dated: September 27, 2004

S/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge